# CIRCUIT COURT OF THE CITY OF RICHMOND

In re Corey Richardson

June 23, 2000

Case No. HK 1364-A

BY JUDGE T. J. MARKOW

The parties appeared on Morris and Dianne Rose's appeal from a custody and visitation order of the Juvenile and Domestic Court and evidence was presented and argument was heard. The order awards full custody of the child, Corey Richardson, to his biological father, Bruce Richardson.

On appeal, the Roses seek visitation with the child, asserting that their former role as the child's foster parents establishes the Roses as "persons with a legitimate interest" under Va. Code § 20-124.2 (1950 & Supp.). The facts are not seriously in dispute.

Corey Richardson was born to Vicki Harris and Bruce Richardson on July 27, 1995. Originally, the child's mother was the sole care provider while the child's father was incarcerated in February 1995 until March 1997 for violating parole of drug related charges. Due to the mother's neglect, Corey was placed with the Roses as foster parents in October 1995. The goal of Corey's foster care plan has always been to place him with his biological father.

As foster parents, Mr. and Mrs. Rose received Corey into their home when he was between two and three months old. Mr. Richardson stipulated that the couple are upstanding residents of the community. The Roses always knew that the goal for Corey was a return home to his father's permanent custody. Mr. Richardson stipulated that, during the first three years of the child's life, the Roses provided wonderfully for Corey with demonstrated caring, support, and affection.

Six months after Corey's arrival in their home, the Roses received another foster child, Ruthie. She is now five and one half years old. The relationship between the children was described by Mrs. Rose as that of brother and sister. She conveyed that Ruthie misses Corey very much.

Over the years, the Roses maintained regular contact with Mr. Richardson, sending letters and photos, as well as cards from Corey. Once released from prison, Mr. Richardson was welcomed into the Roses' home for visitation with his son. While staying with friends immediately after incarceration, Mr. Richardson could not yet provide appropriate living arrangements for his son to return home. During that first year after Mr. Richardson's release, he visited with Corey once per week for four to five hours each time.

In June 1998, Mr. Richardson and his wife, Lisa Richardson, took Corey for his first overnight visit with them on the evening of their honeymoon. Thereafter, Corey began regular weekend visits with Mr. and Mrs. Richardson until October 1998. Then, Corey began staying with his father and stepmother during the week. However, Corey continued to visit the Roses on weekends, building a strong relationship with his father while carrying on a beneficial and healthy relationship with his former foster parents.

Mr. and Mrs. Rose agreed that Mr. Richardson complied fully with the instructions of the Department of Social Services. They stipulate that he is a good, caring father to Corey. Mr. Goodman, a social worker with DSS, corroborated that testimony and noted that Mr. Richardson kept contact with the agency during his incarceration. The parties also agreed that Mr. Richardson made extra efforts to accommodate the Roses regarding his visitations. However, around the time when Corey returned to his father's in October 1998, problems began to emerge.

While Corey's relationships with both his father and his former foster parents flourished, tension developed between the adults in this case. For example, conflict arose when the parties attempted to plan Christmas visitation in 1998. Then, on December 24, 1998, the Roses filed a petition in the Juvenile and Domestic Relations Court seeking full custody of Corey and a DNA test to establish Mr. Richardson's paternity. The Roses said that, based on information received from Corey's mother, they believed that Mr. Richardson may not have been Corey's biological father. Once the test established Mr. Richardson as Corey's father, the Roses dropped their petition.

Also in December, a miscommunication between Mrs. Rose and Mr. Richardson resulted in more conflict. Mrs. Rose called Mr. Richardson to tell him that Corey's preschool phoned her, saying Corey was upset. Mrs. Rose offered to pick up the child. The parties' understanding is unclear as to how the situation was going to be handled, but Mrs. Rose understood that she would get Corey for Mr. Richardson. She did so. However, Mr. Richardson must have had a different understanding because he arranged for Mrs.

Richardson to pick up the child. Thus, when Mrs. Richardson arrived at Corey's school, he was gone because Mrs. Rose arrived first. Mr. Richardson called DSS to complain of Mrs. Rose's behavior. She subsequently received a call from DSS chastising her.

The rising tension continued through June 1999 when the judge below awarded full custody of Corey to Mr. Richardson. After the award, the Roses did not see Corey until February 14, 2000, for an evaluation in this case by Ms. Sara E. Coxen, a licensed clinical social worker. Ms. Coxen's report was presented and considered along with the other evidence in the case.

In her evaluation, Ms. Coxen concluded that "Corey's current ability to form appropriate and satisfying relationships is built on his early, positive experience with the Roses." Ms. Coxen also suggests that Corey's separation from the Roses is the psychological equivalent to the death of a parent, placing him in significant risk for depression, lowered self-esteem, and guilt in later years. Though Corey appears well-adjusted, Ms. Coxen believes that Corey needs both the Roses as his first "psychological" parents and the Richardsons to together support his love for all of them. Like a child enduring a hostile custody battle in a divorce, Corey is more likely to grow psychologically healthier, Ms. Coxen believes, if the Richardsons accept and invite contact between Corey and the Roses. Accordingly, the Roses must reciprocate with equal understanding and encouragement.

Evaluating the Richardsons, Ms. Coxen found the home to be stable, warm, and loving for Corey. She reports that the Richardsons believe that having the Roses move out of Corey's life would be best for him. Their attitudes towards the Roses were not always so disapproving, Ms. Coxen recounts. However, she adds, the more recent events overshadow the couples' past cooperation which was maintained in Corey's interest.

In addition to Ms. Coxen's testimony, Dr. Eloise Cobb offered her insights based upon her reading of Ms. Coxen's report. Dr. Cobb agreed that Corey is at some risk for adjustment problems, but also testified that children in foster care encounter the best outcome if they can be returned home to their parents. Dr. Cobb disagreed that continued visitation with the Roses is best, and she focused on Corey's current adjustment. She noted that Corey is progressing well, according to Ms. Coxen's observation, and that Corey's current status is the best indicator for the future. As Corey is doing well, Dr. Cobb concluded that he will probably continue to improve.

Though Dr. Cobb conceded that she could not say absolutely that Corey's separation from the Roses will cause a prospective problem, she added that she would have expected behavioral problems to show up promptly upon

separation. The biggest risk factor for Corey that Dr. Cobb cited was the child's initial neglectful situation remedied by foster care.

In addition to the Roses' evidence and that of the two experts, the court was presented with brief testimony from Ms. Harris, the child's mother. Ms. Harris stated that Corey was taken from her because of her drug problem and that, before seeing him recently with the Roses, she had not seen Corey since he was eleven months old. She testified that she was upset that the Roses were cut off from Corey and requested that the court order continued visitation.

Additionally, Ms. Harris has been convicted of what she described as many felonies. She currently pays child support to DSS for Corey, but did not state the amount. She stays out of Corey's life, she says, because her presence would be too disruptive for Corey.

Finally, Mr. Richardson testified about Corey's current home with Mr. and Mrs. Richardson and Mrs. Richardson's two other children from a different father. Mr. Richardson stated that Corey is doing fine, that they are all getting along well, and that Corey has not exhibited any behavioral problems. Corey played soccer and T-ball. Mr. Richardson even coached this past spring. Next year, Corey will begin kindergarten and he is doing well in day care.

Mr. Richardson is appreciative of what the Roses have done for him and his son. He has a good relationship with them, he believes. Recently, Mr. Richardson and Mr. Rose spoke and unsuccessfully tried to come to an agreement in this matter, but left each other with a mutual respect.

Mr. Richardson continued that he does not want a court order requiring him to allow the Roses visitation with his son. He says that visitation with the Roses sometimes confuses the situation and can be disruptive to the family.

In argument, Mr. Richardson first challenges Va. Code § 20-124.2 as unconstitutional on its face, arguing that the recent case of *Troxel v. Granville*, 530 U.S. ___, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), applies. The Roses argue that the Virginia Supreme Court's interpretation of the statute in *Williams v. Williams*, 256 Va. 19, 501 S.E.2d 417 (1998), shows that the statute as applied is constitutional, notwithstanding the ruling in *Troxel*. The court first looks to the statute.

As regards custody determinations, Va. Code § 20-124.2(B) states that "the court shall give primary consideration to the best interests of the child." Relevant to the case at bar, Va. Code § 20-124.2(B) adds:

> The court shall give due regard to the primacy of the parent-child relationship but may upon a showing by clear and convincing evidence that the best interest of the child would be served thereby

· award custody or visitation to any other person with a legitimate interest.

Despite the broad sounding language of the statute, the Court of Appeals and, subsequently, the Supreme Court construed the statute to require that "a court must find actual harm to the child's health or welfare without such visitation." *Williams*, 256 Va. at 22. This interpretation, the Virginia Supreme Court concluded, saved the statute from a constitutional challenge based on the Fourteenth Amendment to the Federal Constitution. See *id.* ·

Significantly, the constitutional challenge raised against a Washington State statute in *Troxel* was also based on the Fourteenth Amendment. *See Troxel*, 530 U.S. at ___, 120 S. Ct. at 2059-60. The Washington law purported to vest in the court authority, exclusive of the child's parent, to order visitation to any person as long as the visitation serves the "best interests of the child." *See Troxel*, 530 U.S. at ___, 120 S. Ct. at 2057. There, the U.S. Supreme Court affirmed a decision of the Washington Supreme Court, striking down the statute and characterizing it as "breathtakingly broad." *See Troxel*, 530 U.S. at ___, 120 S. Ct. at 2060.

In contrast to the Washington Court, the Virginia Supreme Court decided to read Virginia's nonparental visitation statute so that it would be constitutional as applied. *See Williams*, 256 Va. 19, 501 S.E.2d 417. Furthermore, dicta in the *Troxel* opinion suggests that the Virginia Supreme Court's decision would withstand scrutiny on appeal. *See Troxel*, 530 U.S. at ___, 120 S. Ct. at 2064 ("Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter.) (*citing Williams*, 256 Va. 19, 501 S.E.2d 417). Thus, the court rejects the constitutional challenge to Va. Code § 20-124.2 and finds that the threshold issue in this case, under *Williams*, is whether Corey's health or welfare would suffer actual harm from his father's denial of the Roses' visitation.

Assuming that the Roses are "persons with a legitimate interest" as defined in Va. Code § 20-124.1, the court does not find that Corey would suffer actual harm by not seeing them regularly. Corey is doing very well with his father and family. Although Ms. Harris, the biological mother, requests that visitation continue, her absence from Corey's life and her decision to maintain that absence means that her testimony should be given less weight than that of other witnesses.

Corey may be at higher risk, even significantly higher risk for depression and related disorders due to the separation from the Roses. However, the

support he is receiving in his home and the lack of serious problems to date lend confidence that Corey is in a healthy environment with his father where he will continue to progress. The above holds despite what might have occurred during the isolated incident at school due to which he had to be picked up.

Clearly, the Roses are exceptional people, as foster parents must be in order to provide the care they do for the children of others. The court has no doubt that continued visitation with the Roses would be in Corey's best interests as they wish to be his friends able to help for the rest of his life, as Mr. Rose put it. Such a relationship, if cultivated with respect to Mr. Richardson's concerns as Corey's father, would leave Corey stronger and healthier emotionally, a result sought by all parties involved. However, the potential for added benefit to Corey does not allow the court to abridge Mr. Richardson's fundamental rights as Corey's parent and to require that he allow nonparental visitation.

Finally, the court is not certain that Mr. Richardson will stop Corey from seeing the Roses completely given his appreciation and respect for the couple. Recent events in the parties' relationships, misunderstandings, and appearances in court obviously lead to tense moments between individuals. Another factor may be a conflict between the parties expectations during Corey's foster care of how the future would be handled. The court would encourage, perhaps after some time, that the parties work as they once did to find a mutually beneficial resolution in the interests of Corey. There is no doubt that this is in his best interests.

It is, therefore, ordered that the Roses' petition for visitation appealing the order of the Juvenile and Domestic Relations Court is denied, and this case is remanded to the Juvenile and Domestic Relations Court for any further proceedings. As previously announced, Mr. Richardson is responsible to pay one half of the costs for the evaluation conducted by Ms. Coxen.